## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-KA-01189-SCT

*JOHN WESLEY LEWIS, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/95 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN W. CHRISTOPHER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/17/1998 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/7/99 |

**EN BANC.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

## I. <u>INTRODUCTION</u>

¶1. This case arises from the October 14, 1993, double murder and robbery of Gertrude and Willie Woods (the elderly great aunt and uncle of the appellant). The appellant, John Wesley, Lewis, III, was indicted on two counts of capital murder April 12, 1994. In July, 1995, Lewis was tried and convicted on both counts in the First Judicial District of the Hinds County Circuit Court. The jury was unable to unanimously agree on sentencing, and the trial judge sentenced Lewis to two, consecutive terms of life imprisonment.

¶2. On July 31, 1995, Lewis moved for a new trial. The motion was denied September 30, 1996. Lewis appeals, *in forma pauperis*, and raises the following issues for consideration by this Court:

**A. Whether the trial judge committed reversible error in denying appellant's motion to suppress certain evidence, or to continue the trial, because of the State's failure to comply with discovery on**

**certain evidence and certain witnesses less than one month before trial?**

**B. Whether the trial judge committed reversible error in denying the appellant the right to make a demonstration before the jury by trying on a pair of shoes which were admitted into evidence, without the appellant being required to take the stand as a witness?**

**C. Whether the conduct of certain jurors in failing to disclose information requested on *voir dire* deprived the appellant of a fair trial?**

¶3. The issues raised by the appellant are without merit. However, this case presents a question of first impression regarding a criminal defendant's ability to present material, demonstrative evidence. This Court holds that, if the State could require the demonstration without violating the Fifth Amendment, then the defendant may make the demonstration without waiving his Fifth Amendment protection against self-incrimination. Because the demonstrative evidence sought to be introduced by the appellant in this case was immaterial, the demonstration was properly excluded. Accordingly, the judgment of the trial court is affirmed.

## II. <u>STATEMENT OF THE FACTS</u>

¶4. Willie Woods (age 79) and Gertrude Woods (age 75) had been married for over sixty years. Shortly before 8:00 p.m. on October, 14, 1993, they were brutally attacked in their home.

¶5. The assailant chased Gertrude Woods outside. According to witnesses, Mrs. Woods fought her attacker, and he threw her to the ground and kicked her in the head. She was stabbed many times, and two of the wounds were fatal. She did not die immediately, but lay on the ground with a cut throat and a pierced chest wall. The medical evidence indicated that she would have felt a drowning or smothering sensation for minutes. Ultimately, Mrs. Woods died in her own driveway.

¶6. The police found Willie Woods in the bedroom. He had been stabbed repeatedly in the neck and face. In addition, the medical evidence indicated that Mr. Woods had been strangled with enough force to break the hyoid bone in his neck. Mr. Woods was taken to the hospital, but his injuries caused swelling in the brain and multiple organ failure; this was complicated by the development of bilateral bronchial pneumonia. The doctors drilled a hole in Mr. Woods' skull to ease the swelling, but he died October 26, 1993. According to the doctor who performed the autopsy, Willie "died inch by inch, day by day, and he went through hell until he died."

¶7. The attacker fled the scene with one or more of Mrs. Woods' purses. Based on physique and voice, one neighbor positively identified Lewis as the assailant. The neighbor also identified Lewis' car as the getaway car. The police seized clothing from Lewis' house, which was similar to that worn by the assailant. In addition, an expert testified that a bloody shoe print from the scene of the crime matched one of Lewis' shoes to the exclusion of any other shoe in the world.

¶8. The police narrowed the time of the attack to 7:30-8:00 that evening. There was evidence that Lewis had worked at his mother's record shop until 7:30. Shortly before 8:00, he called his mother and asked if he could go to the home of Bridget Johnson and Angela Gates. There is conflicting testimony as to what time he arrived. Lewis' friend, Johnson, said that he arrived a little before 8:00. Her roommate, Gates, said he arrived a little before 8:30.

¶9. The Woods lived one mile from Lewis. Sentencing phase testimony indicated that, in the weeks prior to the murders, Lewis had been released twice on bond by the Ridgeland Municipal Court Judge: on August 25, 1993, for attempted armed robbery, and, on September 9, 1993, for strong armed robbery.

## III. <u>LEGAL ANALYSIS</u>

**A. Whether the trial judge committed reversible error in denying appellant's motion to suppress certain evidence, or to continue the trial, because of the State's failure to comply with discovery on certain evidence and certain witnesses less than one month before trial?**

¶10. Lewis first contends that the trial judge erred by admitting the testimony of Joe Andrews, an employee of the Mississippi Crime Laboratory. Andrews compared the bloody footprints found at the scene of the crime with Lewis' shoes. He concluded that one of the bloody prints was made by Lewis' shoe, to the exclusion of every other shoe in the world.

¶11. The record reflects that Lewis filed his discovery request May 16, 1994. Assistant District Attorney Bobby DeLaughter sent the shoe to the Mississippi Crime Laboratory for analysis May 25, 1995. Upon issuance of Andrews' report, DeLaughter promptly forwarded it to defense counsel, who received the report June 16, 1995.

¶12. A suppression hearing was held July 5, 1995. Lewis alleged that the State had withheld the footprint evidence for two years, and that the evidence should be suppressed at the trial, which was scheduled for July 10, 1995. In the alternative, Lewis argued for a three or four week continuance, so that he could obtain a footprint expert to rebut the State's evidence. However, Lewis did not assert that he had attempted to obtain a footprint expert from the time the evidence was received (June 16, 1995) until the date of the suppression hearing (July 5, 1995). The trial judge denied Lewis' motion to suppress Andrews' report, or in the alternative, to continue the trial.

¶13. On appeal, Lewis contends that the trial judge should have suppressed the evidence, or, alternatively, allowed a continuance.

> In *Stewart v. State*, [512 So. 2d 889, 892 (Miss. 1987)], we reversed a conviction because the State withheld discovery until the day before trial and we stated, "Discovery, to be sufficient, must be made at a time far enough in advance of trial to give the defense a 'meaningful opportunity' to make use of it." *Stewart*, at 892. *See also, Turner v. State*, 501 So.2d 350 (Miss.1987); *Gray v. State*, 487 So.2d 1304 (Miss.1986); *Henry v. State*, 484 So.2d 1012 (Miss.1986); *McKinney v. State*, 482 So.2d 1129 (Miss.1986). . . .

> We have addressed the issue of belated discovery in *Foster v. State*, 484 So.2d 1009 (Miss.1986), and held:

> Where the state is tardy in furnishing discovery which it was obligated to disclose, the defendant is entitled upon request to a continuance postponement of the proceedings reasonable under the circumstances. *Henry v. State*, 484 So.2d 1012, 1014 (Miss.1986); *McKinney v. State*, 482 So.2d 1129, 1131 (Miss.1986); *Cabello v. State*, 471 So.2d 332, 343 (Miss.1985); *Box v. State*, 437 So.2d 19, 26 (Miss.1983) (Robertson, J. concurring). By no means does this mean invariably that the defendant will be entitled to a continuance until the next term of court. There will no doubt be

cases where postponement of a day or two, or in some cases even an hour or two, will suffice. . . .

*Foster*, 484 So.2d at 1011. *See also, Stewart v. State*, 512 So.2d 889, 892-93 (Miss.1987).

Having received the untimely discovery furnished by the State, the defense was entitled to a reasonable opportunity to make use of it. . . . if a continuance was necessary to accomplish this, then the defense was entitled to a continuance.

*Inman v. State*, 515 So. 2d 1150, 1153-54 (Miss. 1987).

¶14. The trial judge held that the defense had reasonable time to make use of Andrews' report. At the suppression hearing, Lewis requested three or four weeks to obtain an expert to rebut the report. However, Lewis had three or four weeks from the date he received the information (June 16, 1995) until the trial (July 10, 1995). Moreover, Lewis had five days from the suppression hearing (July 5, 1995) until the trial (July 10, 1995) to find someone who could rebut the footprint analysis[1] -- if such a person existed.

¶15. The record reflects that Lewis had a meaningful opportunity to make use of Andrews' report, and that no discovery violation occurred. Therefore, the trial judge properly denied Lewis' motion to suppress Andrews' report, or in the alternative, to continue the trial. *Id.*

¶16. Lewis further contends that, during Andrews' trial testimony, the State introduced exhibits comparing Lewis' shoe to the bloody shoe print. Lewis objected to the introduction of one of the exhibits "for the same reason" as that expressed in the motion to suppress. That "reason" was the tardy disclosure of Andrews' conclusions. Lewis did not object to the introduction of the other exhibits or ask for a continuance, and he did not mention at trial that he had never seen these exhibits. A "trial judge cannot be put in error on a matter which was not presented to him for decision." *McGowan v. State*, 706 So. 2d 231, 241 (Miss. 1997).

¶17. Furthermore, it seems disingenuous for Lewis to claim prejudice or ambush by the actual visual comparisons themselves, when he was clearly aware that Andrews would testify about such comparisons. *See Brown v. State*, 690 So. 2d 276, 289 (Miss. 1996) (no discovery violation where appellant knew that shoe print expert would make general comparison and expert testified regarding specific characteristics of toe of shoe, because it was "obvious from looking at the evidence of the bloody shoe prints with a naked layman's eye that attention would focus on the toe area of [appellant's] shoe"). Therefore, Lewis' argument on this point is also without merit.

**B. Whether the trial judge committed reversible error in denying the appellant the right to make a demonstration before the jury by trying on a pair of shoes which were admitted into evidence, without the appellant being required to take the stand as a witness?**

¶18. Lewis also argues that he should have been allowed to don Exhibit 66 (a pair of black, Fila tennis shoes) in order for the jury to consider the fit of the shoes. There were two pairs of black, Fila tennis shoes in this case: a) Exhibit 66, size 12 shoes, which the police contended were worn by Lewis at the time of his arrest, and b) Exhibit 75, shoes with white paint on them, which the police contended were seized from Lewis' room with a search warrant.

¶19. Lewis' mother testified that the officers were lying or had confused the shoes, because her son wore a size 13 shoe, and she had seen him wearing Exhibit 75 -- the "work shoes" (the ones with paint on them) --

at 7:30 the night of the murders. In addition, Lewis' mother "knew" that Lewis was wearing Exhibit 75 at the time of arrest, because they were his "work shoes" and he was arrested at work.

¶20. However, it is undisputed that both pairs of shoes belonged to Lewis (whether they were taken from his bedroom or his feet). The right shoe from Exhibit 66 was identified as having made the bloody footprint at the scene of the crime.

¶21. The record reflects that the shoes in Exhibit 66 were admitted (over objection) during the testimony of State witness, Detective Ned Garner. During cross-examination, defense counsel asked Detective Garner what size shoe Lewis wore. Detective Garner did not know, and defense counsel attempted to have the shoes in Exhibit 66 placed on Lewis' feet. The State objected, and the trial judge held, "You certainly are entitled to make that exhibition to the jury, but not with this witness. When you have your case in chief, Mr. [Defense Attorney], you can do so."

¶22. Later, during Lewis' case-in-chief, the defense attorney attempted to have Lewis don the shoes. The State objected to Lewis' exhibiting the fit of the shoes, unless Lewis took the stand, under oath. The trial judge held that exhibiting the fit of the shoes would waive Lewis' Fifth Amendment right against self-incrimination. That is, the trial judge would allow Lewis to make the demonstration, but only if Lewis took the stand and subjected himself to cross-examination.

¶23. On appeal, Lewis argues that he should have been allowed to put the shoes on his feet, and that such a demonstration would not waive his Fifth Amendment right against self-incrimination. Clearly, the defendant can be required to make such demonstrations, without violating the Fifth Amendment. *See, e.g., Porter v. State*, 519 So. 2d 1230, 1232 (Miss. 1988) (defendant can be required to demonstrate scar on his hand); *McCrory v. State*, 342 So. 2d 897, 899 (Miss. 1977) (defendant can be required to give fingerprints and handwriting exemplar, because "the Fifth Amendment only bars the compelled production of testimonial evidence, as opposed to identifying physical characteristics"); *Thames v. State*, 73 So. 2d 134, 137 (Miss. 1954) (defendant can be required to stand).

> [L]ong ago, the United States Supreme Court held that an accused's Fifth Amendment rights are not offended when the accused is compelled to put on clothing identified with a crime, to see if it fits, because "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." . . . The Fifth Amendment privilege "is a bar against compelling 'communications' or 'testimony', but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

*United States v. Craft*, 691 F. 2d 205, 206-7 (5th Cir. 1982) (citations omitted).

¶24. Lewis argues that, because the State could have compelled him to demonstrate the fit of the shoes, he is entitled to a level playing field, and cannot be denied the right to make the same demonstration before the jury. This is a case of first impression in Mississippi. Two other jurisdictions have considered this question and held that the criminal defendant does not waive his Fifth Amendment right against self-incrimination by demonstrating the fit of shoes introduced by the State. *See State v. Suddeth*, 306 N.W. 2d 786, 787-88 (Iowa 1981); *State v. Norris*, 577 S. W. 2d 941, 948-49 (Mo. App. 1979).

¶25. This authority is persuasive. The criminal defendant is allowed to make nontestimonial demonstrations,

where such demonstrations are relevant. However, the case *sub judice* can be factually distinguished from **Suddeth** and **Norris**, because the shoes in those cases were found at the crime scene, and the ownership of the shoes was at issue. *See Suddeth*, 306 N.W. 2d at 787-88; *Norris*, 577 S. W. 2d at 948-49. If Suddeth or Norris had been allowed to try on the shoes, the fit would have been relevant as to whether they could have left the shoe at the scene of the crime. In the case at hand, the ownership of the shoes is not at issue. It is undisputed that the defendant was wearing the shoes when he was arrested.[2]

¶26. The admission of "reasonably necessary and material" demonstrative evidence is within the discretion of the trial court. **Murriel v. State**, 515 So. 2d 952, 956 (Miss. 1987) (quoting **Gandy v. State**, 373 So. 2d 1042, 1047 (Miss. 1979)); **Hansen v. State**, 592 So. 2d 114, 131-32 (Miss. 1991) (holding that trial court's determination of whether demonstrative evidence is "appropriate and relevant" will be upheld, unless abuse of discretion occurs and is "prejudicial to the accused").

¶27. Moreover, because "the types of demonstrative evidence and the purposes for which it is sought to be introduced are extremely varied, it is generally viewed as appropriate to accord the trial judge broad discretion in ruling upon the admissibility of many types of demonstrative evidence." **Murriel v. State**, 515 So. 2d 952, 956 (Miss. 1987) (quoting **McCormick on Evidence** § 212 at 665 (E. Cleary 3d ed. 1984)). Therefore, even though the trial court misconstrued the Fifth Amendment in excluding Lewis' proposed demonstration, the shoes were properly excluded, given the undisputed testimony of the eyewitnesses that Lewis wore the shoes at the time of his arrest.

¶28. That is, the trial judge properly excluded the demonstration evidence because it was not "appropriate and relevant". *See Murriel*, 515 So. 2d at 956 (discussing application of M.R.E. 404 which defines relevant evidence as evidence "having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence"). *See also Lacy v. State*, 629 So. 2d 591, 594 (Miss. 1993) (citing M.R.E. 103, which requires reversal based on exclusion of evidence, only where substantial right of party is affected).

¶29. Clearly, the defendant does not waive his Fifth Amendment protections by offering demonstrative evidence, if appropriate and relevant. That is, if the State could require the demonstration without violating the Fifth Amendment, then the defendant may make the demonstration without waiving his Fifth Amendment protection against self-incrimination. However, because the demonstration requested by Lewis was irrelevant, his argument on this point is without merit.

## C. Whether the conduct of certain jurors in failing to disclose information requested on *voir dire* deprived the appellant of a fair trial?

¶30. Lewis' final contention is that the trial court should have granted a new trial, because two jurors (Andrew Lee and Jennifer Jacobs)[3] did not respond truthfully during *voir dire*. Lewis bases his argument on juror Ellen Pulliam's testimony at the hearing on the motion for a new trial. Pulliam testified that juror Andrew Lee approached her during guilt phase deliberations, and told her that Willie Woods regained consciousness at the hospital and identified Lewis as the attacker. Pulliam also stated that, during sentencing phase deliberations, juror Jennifer Jacobs commented that Lewis looked like someone who had raped her.

¶31. Lewis notes that, prior to jury selection, LaShun Young, a member of the venire, overheard someone in the courthouse say that whoever committed this crime should be executed. Young mentioned this during individual *voir dire*, but did not know whether the person making the comment was discussing the case *sub*

*judice*.

¶32. Based on Young's comments, Lewis argues that someone was "roaming the halls" of the courthouse with the intention of influencing the jurors. Lewis notes that, during individual *voir dire*, juror Lee denied knowing anything about the case. However, according to juror Pulliam, Lee stated during deliberations that Willie Woods regained consciousness in the hospital and identified Lewis as the attacker. Lewis argues that, either Lee lied during individual *voir dire*, or someone from outside the jury approached Lee after the jury was empaneled. Lewis made this same argument to the trial judge at the hearing on the motion for a new trial, and it was met with skepticism:

> [BY DEFENSE ATTORNEY]: . . .Now, either one of two things happened, Your Honor: Either that juror did not reveal to the Court that he had been approached in the hall with this information before jury selection or during jury selection, or somebody talked to that juror after the trial started.
>
> THE COURT: Or [the events related by juror Pulliam] didn't happen.
>
> [BY DEFENSE ATTORNEY]: Beg your pardon?
>
> THE COURT: Or it didn't happen.
>
> [BY DEFENSE ATTORNEY]: That's right. Or it didn't happen.

¶33. Furthermore, the record reflects that, after the jury was empaneled, and prior to the release of the rest of the venire, the trial judge asked the jury members if they had been approached by anyone with regard to the case. The jurors did not indicate that they had been approached. Therefore, Lewis' allegations on this point -- at least prior to the seating of the jury -- are without merit. ***See Wells v. State***, 698 So. 2d 497, 505 (Miss. 1997) ("We must assume that jurors answer truthfully when polled, else the entire polling procedure is rendered pointless.")

¶34. Moreover, jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations. However, jurors may testify about misconduct in their presence or about outside influences on the jury panel. ***Fairman v. State***, 513 So. 2d 910, 915-16 (Miss. 1987). ***See also*** M. R. E. 606(b) (juror can only testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror").

¶35. Juror Pulliam did not testify that she witnessed misconduct, but she did testify that juror Lee made a comment that was not contained in the record. Assuming that Pulliam's testimony was proper, the question raised here is whether Lee's alleged comments demonstrated an outside influence on the jury, such that Lewis was denied a fair trial.

> In our system of justice, every person charged with a crime is entitled to receive a fair trial before an impartial jury of his peers. Miss. Const. art 3, § 26; U. S. Constitution amend. VI. A jury is to consider only the evidence developed at trial in determining its verdict. ***Fuselier v. State***, 468 So. 2d 45, 57 (Miss. 1985) ("[A] jury's verdict must be based upon the evidence and not affected by extraneous influences.")

***Collins v. State***, 701 So. 2d 791, 794 (Miss. 1997) (holding that trial judge erred by sending law

dictionary into jury room).

¶36. However, there must be sufficient proof of an alleged outside influence. *See King v. State*, 580 So. 2d 1182, 1187 (Miss. 1991); *Williamson*, 512 So. 2d at 882; *Carter v. State*, 493 So. 2d 327, 329 (Miss. 1986). In this case, the proof is very limited as to whether outside information was considered by the jury in rendering its decision. "A mere possibility that [an improper] influence might have been used . . . is not sufficient to justify setting aside this conviction." *Pepper v. State*, 27 So. 2d 842, 843 (Miss. 1946).

¶37. Moreover, the trial judge listened to Pulliam's testimony. He was obviously very skeptical. "The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to make findings of fact which will have the reliability that we need and desire." *Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985).

> Trial judges are vested with much discretion in the conduct of judicial proceedings. *Turner v. State*, 220 So.2d 295, 297 (Miss.1969) . . . We will look with favor upon the action of a trial judge in deciding whether a mistrial or new trial should be ordered on account of an unauthorized communication to a juror. His rulings on such matters will generally not be ground for reversal except in cases where there is an abuse of such discretion below.

*Witherspoon v. State*, 441 So. 2d 1363, 1364 (Miss. 1983) (noting rule against jurors impeaching their own verdict).

¶38. The question of outside influences on a jury is obviously very serious. *Robinson v. State*, 662 So. 2d 1100, 1104 (Miss. 1995). However, "[t]o hold that reversal upon these facts is required would be tantamount to saying that almost any trial could be aborted. . . ." *See Id.* Therefore, this Court declines to do so on the evidence presented.

¶39. Lewis also argues that he is entitled to a new trial based on Pulliam's testimony that juror Jennifer Jacobs commented, during sentencing deliberations, that Lewis looked like someone who had raped her. The record reflects that Jacobs did not reveal that she had been the victim of a violent crime when asked during general *voir dire*.

¶40. As stated earlier, Lewis' argument assumes that juror Pulliam's testimony was proper evidence of alleged misconduct by Jacobs. *See Fairman*, 513 So. 2d at 915-16 (Miss. 1987). With regard to evidence that juror Jacobs remained silent during *voir dire* when asked if she had been a victim of a violent crime:

> *Odom v. State*, 355 So.2d 1381 (Miss.1978) is our seminal case. *Odom* holds that the failure to respond does not warrant this Court granting a defendant/appellant a new trial unless
>
> the question propounded to the juror was (1) relevant to the voir dire examination; (2) ... unambiguous; ... (3) ... the juror had substantial knowledge of the information sought to be elicited ... [and (4) ] prejudice ... in selecting the jury could reasonably be inferred from the juror's failure to respond.
>
> 355 So.2d at 1383.

*Myers v. State*, 565 So. 2d 554, 558 (Miss. 1990); *Chase v. State*, 645 So. 2d 829, 847 (Miss. 1994).

¶41. However, assuming that the first three elements of the *Odom* were met, Lewis has not shown that he was prejudiced by Jacobs' failure to respond during *voir dire*. Moreover, even if Jacobs had disclosed that she had been raped, Lewis would not necessarily have been entitled to a challenge for cause. *Lester v. State*, 692 So. 2d 755, 791 (Miss. 1997) ("courts would be hard-pressed to find people in Hinds County these days who have not at one time or another been victims of crime"). In addition, this case was about murder and robbery, not rape.

¶42. Therefore, it was within the trial judge's discretion as to whether Jacobs' behavior warranted a new trial. *Myers*, 565 So. 2d at 558-59. Lewis has failed to demonstrate that the trial judge abused his discretion in denying the motion for a new trial.

## IV. <u>CONCLUSION</u>

¶43. The issues raised by the appellant are without merit. Accordingly, the judgment of the trial court is affirmed.

¶44. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT II TO RUN CONSECUTIVELY WITH SENTENCE IN COUNT I.**

**PITTMAN, P.J., ROBERTS, SMITH AND MILLS, JJ., CONCUR. WALLER, J., CONCURS IN RESULT ONLY. WALLER, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J., McRAE AND MILLS, JJ.; SULLIVAN, P.J., JOINS IN PART. BANKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY SULLIVAN, P.J.**

### WALLER, JUSTICE, SPECIALLY CONCURRING:

¶45. While I agree with the conclusion reached by the majority in Issue A, I wish to address the discovery violation by the State.

¶46. The disclosure of the shoe evidence by the State was tardy. The district attorney's office had the shoe in its possession almost eighteen (18) months before it was sent to the laboratory for analysis. Regardless of the turnover in the district attorney's office, it was still its responsibility to ensure that all discoverable evidence was disclosed to Lewis.

¶47. Procedurally, Lewis did all that he was required to do when confronted with a possible discovery violation. *See Houston v. State*, 531 So.2d 598, 611-12 (Miss. 1988). Under *Box* and its progeny, the defendant is not required to show prejudice, nor is he required to demonstrate what, if any, efforts have

been made in order to rebut the late discovery. In the case *sub judice*, the trial judge, at least implicitly, appeared to require such a showing. Despite the erroneous implications by the lower court, the granting of a continuance still rests within the trial judge's discretion. *Wilson v. State*, 716 So.2d 1096, 1097 (Miss. 1998)(citations omitted). It is only because the lower court recognized that Lewis had almost a month in which to rebut the evidence that I find the trial judge was within his discretion to deny Lewis' motion for a continuance.

¶48. In closing, it should be noted that URCCC 9.04 applies with equal force to both the State and the defense bar. As such, both sides should do their utmost to comply with the rules.

**PITTMAN, P.J., McRAE AND MILLS, JJ., JOIN THIS OPINION. SULLIVAN, P.J., JOINS IN PART.**

BANKS, JUSTICE, DISSENTING:

¶49. While I agree with the majority on the resolution of the continuance and shoe evidence issues, my reasons differ. I disagree, however, with the resolution of the issue of outside influence on the jury. Accordingly, I dissent.

I.

¶50. With respect to the failure to grant a continuance to deal with the matching shoe issue it is my view that the issue can be resolved by observing that, Lewis has not shown to this day that a continuance would have permitted him to produce evidence bearing on the question of matching the shoe to the print. One of the reasons for requiring that the failure to grant a continuance be asserted as a grounds for new trial in post-trial motions is to allow the trial court and this Court on review, to assess the impact of the failure to grant a continuance. *Jackson v. State*, 423 So. 2d 129, 131-32 (Miss. 1982) (quoting *Colson v. Sims*, 220 So. 2d 345, 347 n.1 (Miss. 1969)); *Metcalf v. State*, 629 So.2d 558, 561-62 (Miss. 1993). It is at this time that the defendant can demonstrate that a continuance would have been of some benefit. This is especially so where, as here, the continuance is requested to respond to a rather narrow evidentiary issue rather than to become generally more prepared. The motion for new trial is an opportunity to demonstrate that there was available expert testimony to refute the state's evidence. Because no such showing was made at the motion for new trial, I find no error in refusing to grant the continuance.

¶51. I have also come to the view that the failure to allow the demonstration is harmless under the circumstances. Those circumstances include the fingerprint and identification evidence as well as the fact that there is no evidence that the shoes were ever worn by anyone other than Lewis and undisputed evidence that they were his and substantial evidence if not completely undisputed, that he was in fact wearing them when arrested. I would not suggest however as the majority does in closing the discussion, that the demonstration was "irrelevant." In my view, the failure to allow the demonstration under the circumstances was harmless in that poor fit or no, it could not possibly countervail the other evidence.

## II.

¶52. Most problematic in my view is the testimony of the juror. A death bed identification is serious business. The failure to disclose that one is the victim of a violent crime is also serious even if less so. Moreover, it is not made less serious simply because the answer would not necessarily give grounds for a strike for cause. Follow-up questions may indeed provide grounds for a strike for cause, and, in any event, a litigant needs truthful information in order to exercise peremptory strikes. ***Miss. Code Ann.*** § 13-5-69 (1972). *See also* ***Hansen v. State***, 592 So. 2d 114, 128 (Miss. 1991); ***Odom v. State***, 355 So. 2d 1381, 1383 (Miss. 1978). Neither is it a sufficient response that, as asserted by the state, the Jacobs disclosure occurred during the penalty phase and Lewis did not get the death penalty. While the disclosure occurred then, the condition disclosed was present throughout the trial.

¶53. I would perhaps be more comfortable if the trial court had made some finding of fact. It didn't. I do not take the remark that it is possible that the event related by juror Pulliam did not occur as any more than a statement of fact as to the possibilities, as opposed to any indication of an assessment of Pulliam's credibility. Clearly there is nothing in the record that suggests that Pulliam was so lacking in credibility that her testimony did not require a further inquiry under ***Gladney v. Clarksdale Beverage Co.,*** 625 So. 2d 407 (Miss. 1993). It seems to me that testimony under oath that a juror related a deathbed identification of the killer by the uncle of the killer which identification was not otherwise in evidence is too powerful to ignore and warrants further inquiry standing alone. While the Jacobs issue is less serious, it simply compounds the problem. If she in fact harbored ill will because of a prior violent crime or attempted crime her guilt vote may also have been affected.

¶54. The implicit comparison to ***Robinson v. State*** in the majority opinion, is simply not apt. ***Robinson*** dealt with a venireman who did not sit on the jury and a question posed by the prosecutor during voir dire which suggested that the prosecutor knew a fact, the location of the criminal event involving the venireman's relative, the source of which is not readily apparent on the record. Without having objected at trial the defendant made the leap from that exchange to a contention that there was jury tampering. It is that contention which this court referred to with the quoted language in the majority opinion. Majority opinion ante, p. 15. That contention is a far cry from what we have here.

¶55. The evidence of guilt is an identification by someone who never saw the killer's face, a palm print that could be explained by the mother's testimony and the bloody shoe print evidence. While the shoe print evidence is compelling, I am not convinced that it is so compelling that the indicated jury transgression is harmless. I would reverse and remand this case to the trial court for new trial.

**SULLIVAN, P.J., JOINS THIS OPINION IN PART.**

1. The jury selection in this trial lasted more than three days, and the first witness did not testify until July 14, 1995. The defense did not present its case until July 18, 1995. So, Lewis actually had several additional days to locate a footprint expert.

2. All of the officers present at the arrest identified the shoes in (Exhibit 66) as those worn by the Lewis at the time of his arrest. The right shoe from this pair was identified by an expert as having made the bloody

footprint at the scene of the crime -- to the exclusion of every other shoe in the world. Lewis' mother testified that the officers were lying or had the shoes in Exhibit 66 confused with the shoes seized from Lewis' bedroom. She assumed this because the shoes in Exhibit 66 were not Lewis' "work shoes", and he was arrested at work. However, Lewis' mother was not present at his arrest. Moreover, even if the officers were confused as to which shoes were taken from Lewis' feet and which shoes were taken from Lewis' bedroom, there is no evidence that the shoes that made the bloody footprint at the scene of the crime belonged to anyone other than Lewis.

3. Pulliam also testified that, during guilt phase deliberations, juror Kay Baucum said "something about someone holding her friends up at gunpoint" However, Lewis only raises the conduct of jurors Lee and Jacobs on appeal.